UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARQUE BOWERS,

    Plaintiff,

  v.

THOMAS DART, Sheriff of Cook County, et al.,

    Defendants.

No. 16 CV 2483

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Marque Bowers, a wheelchair-bound inmate, brings this action against defendants, Thomas Dart, Sheriff of Cook County, and Cook County, Illinois, for failing to provide him an accessible toilet and shower in violation of the Americans with Disabilities Act, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794(a). Bowers moves for partial summary judgment on the issue of liability. For the following reasons, Bowers's motion is denied.

### I. Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986). A court must view all facts and reasonable inferences in the light most favorable to the non-moving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013).

II. **Background**

Bowers entered the Cook County Jail on October 20, 2011. [110] ¶ 1.[1] While incarcerated there, inmates attacked Bowers. [79-4] at 40, 95:6–9. He was transported to a hospital for medical treatment. [110] ¶ 2. At the hospital, Dr. Raskin examined Bowers; her report states: "He has great difficulty articulating in a more specific or descriptive fashion whether he is experiencing true weakness, numbness, and/or paresthesias of his limbs." [96-5] at 5. After performing a number of tests on Bowers, Dr. Raskin noted, "It is difficult to interpret the patient's exam at this time. There is an obvious absence of voluntary effort, coupled with inconsistent sensory responses and potential pain limitation." *Id.* at 6. For example, Dr. Raskin tested Bowers's claim of leg paresis (weakness or loss of movement) by cupping her hands below his heels and asking him to raise one leg. [96-4] at 36:12–18. A patient who is truly trying to lift his leg, but who may have weakness in that leg, will try to compensate for any weakness in the moving leg by digging the

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from defendants' responses to Bowers's Local Rule 56.1 statements, [95], where both the asserted fact and the opposing party's response are set forth in one document. Any arguments raised in the Local Rule 56.1 statements, additional facts included in responses or replies, and statements that are unsupported by admissible evidence (or where a party fails to follow Local Rule 56.1's direction to cite to supporting material in the record) will be disregarded. Only facts that are properly controverted will be considered disputed.

stationary leg into the bed, and the doctor would be able to detect that force in her hands beneath the patient's heels. *Id.* at 36:19–24. When Bowers attempted to raise one leg, Dr. Raskin did not sense any force in Bowers's heels, thereby making Dr. Raskin question the reliability of Bowers's supposed effort to lift his leg. *Id.* at 37:3–5. Dr. Raskin diagnosed Bowers with L1-L4 transverse process fractures, *see* [110] ¶ 3; but, she testified that a transverse process fracture typically cannot produce a neurologic deficit or paralysis, of which Bowers was complaining. [96-4] at 9:12–17, 58:20–59:19.

During a subsequent examination, approximately six months after the attack, Dr. Raskin noted that Bowers complained that he could not move his legs below the knee, that his legs and feet felt "ice cold," and that he felt pain around his spine. [96-5] at 2. He confirmed that he had normal bowel and bladder function, and he denied numbness of his buttocks or genitalia, which indicated to Dr. Raskin that Bowers's lower lumbosacral nerve roots were properly functioning, *id.*; [110] ¶ 7. Additionally, Dr. Raskin noted: "no voluntary movement of lower extremities [. . .] however, normal tone is present," and no "Hoffman" or "clonus" were detected. [96-5] at 3. "Hoffman" and "clonus" are reflex tests that help doctors determine if a motor neuron disease is present—"Hoffman" tests the upper extremities and "clonus" tests the lower extremities. [96-4] at 29:8–14. When "Hoffman" and "clonus" are not detected, that means there is no sign of motor neuron disease. *Id.* Using these tests on Bowers, Dr. Raskin concluded that he did not have motor neuron disease in either his upper or lower extremities. *Id.*; [96-5] at 3.

3

Dr. Defuniak treated Bowers at the Cermak Health Services Building.[2] [96-6] at 64:6–7, 70:24–25.[3] Consistent with Dr. Raskin's observations and diagnosis, Dr. Defuniak noted that Bowers sustained a fractured spinous process, which did not appear to injure Bowers's spinal cord. *Id.* at 72:14–73:3. According to Dr. Defuniak, a fractured spinous process does not typically cause injury to the spinal cord, nor does it cause complete paralysis to the lower extremities. *Id.* at 72:23–73:9. As such, Dr. Defuniak testified that there was no objective medical evidence that would confirm that Bowers was paralyzed. *Id.* at 73:10–13. Dr. Defuniak wanted to perform further testing on Bowers because he "was concerned [in October 2013] that we still didn't have a reason for why [Bowers] was still not able to move his legs." *Id.* at 74:1–9. Bowers refused to undergo further testing, even though Dr. Defuniak explained that a failure to properly diagnose him could lead to a permanent condition. *Id.* at 74:10–15. Under these circumstances, Dr. Defuniak asked Bowers to sign a refusal to consent to evaluation or treatment; and Bowers signed that form on October 23, 2013. *Id.* at 73:22–74:3. Despite Dr. Defuniak's inability to determine the cause of Bowers's reported paralysis, he prescribed Bowers a wheelchair based solely on Bowers's subjective complaints.[4] *Id.* at 73:14–18, 74:23–25.

---

[2] Cermak was constructed in 1998 and it provides detainees with medical services on site. [110] ¶ 9.

[3] To the extent that deposition testimony from prior related cases is cited here, defendants' objection to such use is overruled. *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014); *Shultz v. Dart*, No. 13 C 3641, 2016 WL 212930, at *4–5 (N.D. Ill. Jan. 19, 2016).

[4] Dr. Defuniak explained that detainees sometimes feign paralysis or an inability to walk for some type of gain—guaranteeing access to sit in a chair or wanting to look sympathetic. [96-6] at 62:7–63:10.

When Bowers returned to Cook County Jail[5] from the hospital in January 2013, he used a wheelchair to move from place to place.[6] [95] ¶ 29. Bowers says he is paralyzed from the attack—that he is unable to walk and that he must wear a diaper. [79-4] at 40, 96:7–11; *id.* at 41, 98:6–8. He says that he has had trouble controlling his bladder and bowels since day one, and that it has worsened over time. [96-7] at 17:12–17. Bowers admits that he can move his legs slightly and that he can wiggle his toes. [110] ¶ 8. Throughout his incarceration, Bowers was assigned to several different cells—most of which were not ADA-compliant. *See, e.g.*, [95] ¶¶ 51–53.

First, Bowers was assigned to cell 3221 on Cermak 3 West, which was not ADA-compliant. *Id.* ¶¶ 31, 35. He used cell 3221's toilet by shimmying onto it sideways. [110] ¶ 16. He fell several times in attempting to transfer himself on and off the cell's toilet. [95] ¶ 33. Bowers used the group showers on Cermak 3 West, which did not have a bench or a mounted seat; when he showered there, he had to use a designated shower chair. [79-4] at 99–100, 84:8–85:17. He fell approximately twelve times while trying to bathe himself in the group shower on Cermak 3 West. *Id.* at 92, 55:8–21. As a result of those falls, Bowers injured his knee, elbow, and

---

[5] Cook County operates Cermak, and it is responsible for all medical care provided at Cermak. *Everett v. Cook Cty.*, 655 F.3d 723, 725 (7th Cir. 2011). The Cook County Sheriff's Office administers the Cook County Department of Corrections at large, *see* 55 ILCS 5/3-15003; and Cermak is one of its correctional facilities. *See Clemons v. Dart*, 168 F.Supp.3d 1060, 1063 (N.D. Ill. 2016) ("Although county medical staff provide medical care to the inmates housed at Cermak, ultimately Cermak is a correctional facility that falls under the control and supervision of defendant Sheriff Thomas Dart, as he administers the Cook County Department of Corrections at large.").

[6] Bowers had a prescription for a wheelchair from at least September 26, 2014 to August 9, 2016. [95] ¶ 3. Only doctors from Cermak Health Services (the jail's medical care provider) prescribe wheelchairs to detainees at the Cook County Jail. *Id.* ¶ 2.

5

back. [95] ¶ 43. He received ice packs for these injuries, but he never saw a doctor. [110] ¶ 17. Additionally, for the first several months of being housed in Cermak 3 West, Bowers said that he "showered" by pouring water over himself with a pail because the shower heads were not placed in a location that would allow a seated person (like him) to be sprayed by the water. [95] ¶¶ 38–39; [79-4] at 91, 51:3–19. On March 19, 2013, Bowers filed a grievance about being assigned to a cell that did not have an accessible toilet, sink, or shower, [95] ¶ 34. Approximately five months later, Bowers filed another grievance about his fall in the Cermak 3 West shower room due to a broken shower chair; he complained that he required assistance from a nurse to get off the floor and back into the shower chair. *Id.* ¶ 41. In August and September of 2013, defendants installed lower shower heads and more grab bars on the third floor, [110] ¶ 12, which allowed Bowers to shower more safely and conveniently. [79-4] at 51:8–22.

Next, Bowers was assigned to cell 3225 on Cermak 3 North, which was not ADA-compliant. [95] ¶¶ 44–45. Bowers said the crowded conditions in cell 3225 blocked his ability to maneuver to the toilet. *Id.* ¶ 46. Bowers filed a grievance, stating that the crowded conditions in cell 3225, at one point, caused Bowers to defecate on himself. *Id.* ¶ 49.

In August 2014, the Residential Treatment Unit opened at Cook County Jail.[7] *Id.* ¶ 55. Bowers was assigned to two different cells in the RTU—cell 8 on

---

[7] In 2007, Cook County Commissioners approved an eighty-five million dollar construction budget to build a new treatment and residential correctional detainee center that was modernized and that complied with the ADA. [110] ¶ 21. Construction on the RTU began in

6

Tier 3-A, and cell 8 on Tier 3-E, neither of which had any grab bars near the toilet. *Id.* ¶¶ 57–59. In order to go to the bathroom in those cells, Bowers mounted the toilet by shimmying onto it; on occasion he fell while transferring to the toilets in the RTU cells.[8] *Id.* ¶ 60. Bowers was able to side transfer onto the bench and use the shower area in the RTU. [110] ¶ 33.

The Sheriff was aware that there were "periods when there were more people in wheelchairs in Cermak than could be placed in the limited number of ADA accessible cells." [95] ¶ 23. Despite this knowledge, the Sheriff never made an attempt to move wheelchair users assigned to one of Cermak's non-ADA compliant cells to correctional facilities outside the Cook County Jail.[9] *Id.* ¶ 24.

## III. Analysis

Bowers brings claims under the ADA and the Rehabilitation Act. Title II of the ADA prohibits discrimination in the provision of services, programs, and activities by public entities[10] on the basis of an individual's disability. 42 U.S.C. § 12132. Similarly, for any program or activity receiving federal financial assistance, the Rehabilitation Act prohibits a disabled person from being excluded from participating in, being denied the benefits of, or being subjected to

---

2009 with the building opening to full capacity in December of 2014. *Id.* It opened to wheelchair users in August 2014. [95] ¶ 55.

[8] During Bowers's time at the RTU, the only cells designed to comply with the ADA in the RTU were cells 10 in Tiers 3-A and 3-E. *Id.* ¶¶ 61, 63.

[9] From August 1, 2012, to at least June 9, 2015, inmates remanded to the Cook County Sheriff's Office could be housed in other jurisdictions outside of the Cook County Department of Corrections due to security concerns, overcrowding, and the like. [79-2] at 10:12–11:9; [95] ¶ 22.

[10] The ADA defines "public entity" to include "any State or local government" and "any department, agency [. . .] or other instrumentality of a State." 42 U.S.C. § 12131(1).

7

discrimination in any such program or activity. 29 U.S.C. § 794(a). The relief available to Bowers under these statutes is coextensive. *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012). To prevail under either claim, Bowers must establish that he is a "qualified individual with a disability," and that he was denied "the benefits of the services, programs, or activities of a public entity" and that the denial or discrimination was because of his disability. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir.), *cert. denied*, 136 S. Ct. 321 (2015) (citing *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996); 42 U.S.C. § 12132). The Rehabilitation Act also requires that the relevant entity accepted federal funds. *Jaros*, 684 F.3d at 672. The relevant entities here, Cook County and the Cook County Sheriff's Office, accepted federal funds for Illinois state prisons. *Id.*

### A. Disability

Under the ADA, an individual has a "disability" if he can show one of the following: (1) he has a physical or mental impairment that substantially limits one or more of his major life activities, (2) he has a record of such an impairment, or (3) he is regarded as having such an impairment. 42 U.S.C. § 12102; *see also* 28 C.F.R. § 35.101 ("The primary object[ive] [. . .] should be whether entities covered under the ADA have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of 'disability.' The question of whether an individual meets the definition of 'disability' [. . .] should not demand extensive analysis."). Bowers points to the mere fact that he uses a wheelchair to ambulate as evidence that he is a qualified individual with a disability. [80] at 8 (citing *Norfleet v. Walker*, 684 F.3d 688, 690 (7th Cir. 2012)).

That is not sufficient in this particular case. The language from *Norfleet* on which Bowers relies—"[t]o be wheelchair-bound is to be disabled within the [ADA]'s meaning"—is supported by the subsection of the ADA that refers to an individual who has a physical or mental impairment that substantially limits a major life activity. 684 F.3d at 690 (citing 42 U.S.C. § 12102(1)(A)). Although walking is a "major life activit[y]" under the ADA, *see* 42 U.S.C. § 12102(2)(A)), the asserted fact of Bowers's inability to walk is precisely what defendants dispute.

Defendants contend that a reasonable jury could determine that Bowers is not disabled. [99] at 16 n.4. They note that there is no objective evidence in the record that shows that Bowers is disabled. The doctors who treated Bowers questioned whether Bowers was telling the truth when he told them that he could not move his legs below his knees; and they doubted that he was exerting any effort to move his legs during their physical exams. When the exam results did not provide any insights as to the cause of Bowers's reported paralysis, Dr. Defuniak wanted to perform further testing, but Bowers refused. Dr. Defuniak asked Bowers to sign a refusal to consent to evaluation or treatment. Nevertheless, Dr. Defuniak explained that he prescribed Bowers a wheelchair solely based on Bowers's subjective complaints.

In reply, Bowers argues that he is regarded as wheelchair-dependent and that he has a record of needing a wheelchair to ambulate. [111] at 2 (citing *Lacy v. Dart*, No. 14 C 6259, 2015 WL 7351752, at *3 n.6 (N.D. Ill. Nov. 19, 2015)).[11] To

---

[11] In *Lacy v. Dart*, the court granted the plaintiffs' motion to certify a class defined as "all persons presently confined at the [Cook County] Jail who have been classified by Jail

9

support this argument, Bowers points to the fact that defendants provided him a wheelchair beginning in January 2013, [95] ¶ 29, and that a Cermak doctor prescribed him a wheelchair from at least September 26, 2014, to August 9, 2016, *id.* ¶¶ 2–3. While those facts are undisputed, they also must be viewed in the context of the greater record, which makes clear that the reason Bowers received a wheelchair was not because the doctor believed that Bowers could not walk, but only because Bowers claimed he could not walk.

To be "regarded" as having a disability under the ADA, Bowers must establish that he was subjected to an action that the ADA prohibits because of his actual or perceived impairment. 42 U.S.C. § 12102(3)(A). The only actions defendants took in this case, which could potentially run afoul of the ADA, would be failing to provide Bowers with an accessible toilet and shower in his housing assignments. Even assuming that Bowers could establish that fact, there is nothing in the record to support a finding that the actions defendants took in assigning

---

officials as requiring a wheelchair." No. 14 C 6259, 2015 WL 1995576, at *1 (N.D. Ill. Apr. 30, 2015). Bowers was one of the plaintiffs in *Lacy*. *Id.* Defendants opposed class certification for several reasons, including that many of the detainees are not confined to their wheelchairs and have more mobility than others. *Id.* at *2. The court disagreed; it reasoned that the detainees were regarded as having an impairment, or that they had a record of impairment, because defendants provided them with wheelchairs. *Id.* In reaching this conclusion, the court declined to perform individualized evaluations of the plaintiffs' disabilities. *Id.* at *2, *5. This conclusion led to the court's later ruling to grant plaintiffs' motion for partial summary judgment as to each of their individual ADA and Rehabilitation Act claims. *Lacy v. Dart*, No. 14 C 6259, 2015 WL 7351752, at *3 n.6 (N.D. Ill. Nov. 19, 2015) (Notwithstanding "defendants' argument [that] certain plaintiffs do not qualify as [disabled], as the court has previously held, plaintiffs are regarded as having a disability or at least have a record of impairment, 42 U.S.C. § 12102(1), and therefore qualify for protection under the ADA. *Lacy*, 2015 WL 1995576 at *2."). The procedural posture of this case, however, is different. Bowers is the sole plaintiff here and the record includes several pieces of evidence that undermine his testimony that he has a disability under the ADA, and that undermines the suggestion that defendants regarded Bowers as having a disability.

Bowers to certain cells were *because of* Bowers actual or perceived inability to walk. From the record, a jury could conclude that defendants placated Bowers by giving him a wheelchair, by providing him a toilet chair or a shower chair, and by allowing him to use the group showers with lowered shower heads, even though his doctors could not find objective medical evidence of his claimed paralysis.

Similarly, the fact that defendants provided Bowers with a wheelchair for several years does not conclusively prove that Bowers had a history of being unable to perform a major life activity—here, walking. *See* 42 U.S.C. § 12102(1)(B). Although Bowers submits his own deposition testimony to support his assertion that he cannot walk; there is competing deposition testimony from his treating physicians who question the reliability of his claims that he cannot walk and who explain that the various exams they performed on Bowers do not explain his supposed inability to walk, and some of the exams indicated that Bowers may not have been trying to move his legs. Furthermore, the history of Bowers receiving a wheelchair from defendants is not the type of "record" of impairment that the ADA recognizes, because here, the wheelchair prescription was based solely on Bowers's own subjective complaints; it was not based on any objective medical evidence or opinion that he suffered from a physical impairment. *See Kotwica v. Rose Packing Co.*, 637 F.3d 744, 748–49 (7th Cir. 2011) (documents establishing history of hip problems prior to surgery did not satisfy plaintiff's burden to produce evidence establishing a substantial limitation to her ability to engage in a major life activity; and other evidence established that the opposite was true).

In sum, there are disputes of fact as to whether Bowers has a physical impairment that limits a major life activity, whether Bowers has a record of such an impairment, and whether defendants regarded Bowers as having such an impairment. Bowers is not entitled to partial summary judgment on the issue of liability as to his ADA and Rehabilitation Act claims. Although it is not necessary to the decision here, for the sake of completeness, I address the other liability arguments briefed by the parties.

### B. Inaccessible Housing Assignments

Bowers contends that he was denied access to toilets and showers when he was assigned to cells at Cermak that lacked grab bars near the toilet and mounted seats in the shower, and that he was denied access to toilets when he was assigned to cells at the RTU that lacked grab bars near the toilet. Title II of the ADA may be violated if an inmate with a disability is denied access to a facility's toilets and showers. *See Jaros*, 684 F.3d at 672. The ADA requires defendants to take reasonable measures to remove structural and other barriers to accessibility. *Tennessee v. Lane*, 541 U.S. 509, 531 (2004).

The ADA's implementing regulations determine whether a facility is "readily accessible." *Id.* at 554. For facilities like Cermak, which are built or altered after July 26, 1992, but before September 15, 2010, the regulations require compliance with specific architectural accessibility standards as outlined in the Uniform Federal Accessibility Standards[12] or the 1991 ADA Standards for Accessible Design.

---

[12] *See* 41 C.F.R. Pt. 101–19.6, App. A (the "Uniform Federal Accessibility Standards"), available at http://www.access-board.gov/ada-aba/aba-standards-gsa.cfm.

*See* 28 C.F.R. § 35.151(c)(1). Both sets of standards require an accessible toilet to have grab bars installed near the toilet, *see* 28 C.F.R. Pt. 36, App. D, § 4.17.6; UFAS § 4.17.6, and they require an accessible shower to have a mounted shower seat, *see* 28 C.F.R. Pt. 36, App. D, § 4.21.3; UFAS § 4.21.3. For facilities like the RTU, which were built or altered on or after March 15, 2012, the regulations require compliance with the 2010 Standards. *See* 28 C.F.R. § 35.151(c)(3). The 2010 Standards require that "[g]rab bars shall be provided on the side wall closest to the water closet and on the rear wall" of an accessible toilet, *see* 28 C.F.R. Pt. 36, App. D, § 604.5, and that a folding seat shall be installed in accordance with 28 C.F.R. Pt. 36, App. D, § 610.

It is undisputed that defendants assigned Bowers to cells at Cermak that lacked grab bars near the toilet and mounted seats in the shower, and to cells at the RTU that lacked grab bars near the toilet. Notwithstanding, defendants argue that they have not violated the ADA. First, defendants argue that the Cook County Sheriff's Office is not responsible for the facilities in Cermak; that the Cook County Sheriff's Office is only responsible for ensuring that disabled detainees have meaningful access to programs and services at the jail; and that there is evidence in the record that raises the inference that Bowers had meaningful access to programs and services at the jail. [99] at 16–17. Defendants do not cite any authority to support their proposition regarding the responsibility of the Cook County Sheriff's Office over Cermak's facilities; but at least one court in this district has rejected a similar claim in the context of a Title II action, and I am persuaded by that decision. *See Clemons v. Dart*, 168 F.Supp.3d 1060, 1071–72 (N.D. Ill. 2016) ("the Sheriff

points to a line of cases that indicate that Cermak is operated by Cook County [. . .]. But those cases are inapposite here. Clemons' claims relate to his cell assignment and not the provision of inadequate medical treatment, as was the case in each of the [cited] cases.") (collecting cases).

As for defendants' assertion about an inference of meaningful access, I am not convinced. The purpose of the ADA is to "assure equality of opportunity, full participation, independent living, and economic self-sufficiency" for individuals with a disability. *See* 42 U.S.C. § 12101. The requirements outlined by the 1991 ADA Standards, the UFAS, and the 2010 ADA Standards are all in keeping with this broader purpose—mandating the installation of grab bars near a toilet and of a mounted seat in a shower promotes a disabled person's ability to use those facilities independently, much like a non-disabled person would. The accommodations that defendants say they provided Bowers—(1) portable toilet and shower chairs along with nurses who were available to detainees who needed assistance in using the chairs, *see* [99] at 19–20; and (2) access to a communal ADA-compliant toilet upon request, per RTU policy, *id.* at 19 (citing *Flora v. Dart*, No. 15 C 1127, 2017 WL 2152392, at *5 (N.D. Ill. May 17, 2017)))—stand in stark contrast to the grab bars and mounted shower seat, because such "accommodations" do not allow Bowers to use the jail's facility independently or similarly to how a non-disabled person would use similar facilities.

Second, defendants argue that it was Bowers's burden to show that a reasonable accommodation existed and to establish that it was necessary. [99] at 13,

14

17. Since Bowers refused defendants' offer to place him in an ADA-compliant cell on May 24, 2013, Bowers cannot claim that his proposed reasonable accommodations—grab bars near the toilet and a mounted seat in the shower—were necessary. *Id.* at 17. Bowers admits that he refused defendants' offer, [110] ¶ 37, but he adds that the reason for his refusal was that he feared for his safety because he had a problem with another detainee in the proposed room, [111] at 7. Thus, Bowers argues, his refusal cannot be understood as an admission that a reasonable accommodation was not necessary in his case. Furthermore, Bowers suggested that a reasonable accommodation was necessary because he grieved, on three separate occasions, about his housing assignments—first, that his cell did not have an accessible toilet, sink, or shower; second, that he fell in the Cermak 3 West shower room because the shower chair was broken; and third, that he defecated on himself because he was unable to access the toilet due to overcrowding in the cell.[13] The status quo and the policies in practice were not affording Bowers equal access to the jail's toilets and showers. Of course, if Bowers was not disabled, then no accommodation was necessary, but if he establishes that he has a disability, then he has sufficient facts to suggest that an accommodation was necessary.

---

[13] The parties agree that the inmate grievance procedure at Cook County Jail is an instrument of the Cook County Sheriff's Office. [110] ¶ 38. Defendant Cook County argues that, "[c]onsequently, it cannot be said Cook County had knowledge of the risk of harm to [Bowers's] rights secured by the ADA and failed to act." [99] at 20. I disagree. Although Cook County may not have been aware of Bowers's grievances, it is undisputed that Cook County knew that Bowers returned to the jail in a wheelchair and that he was subsequently assigned to cells that were not ADA-compliant; thus, they were on notice of the risk of harm to Bowers's rights.

15

Third, defendants argue that providing Bowers with an accessible cell, grab bars near the toilet, or a mounted shower seat would have caused a "significant 'ripple effect' on fellow inmates [. . .] and the allocation of prison resources generally." [99] at 18 (citing *Turner v. Safley*, 482 U.S. 78, 90 (1987)). Defendants do not explain how or why that would be the case, nor do they cite anything in the record to give context to this assertion; despite this missing information, defendants urge the court to assess the ADA's reasonableness requirement in light of the "overall institutional requirements," and to find that accommodating Bowers would have been burdensome. [99] at 12 (citing *Love*, 103 F.3d at 561), 18. As Bowers notes, defendants do not cite any evidence in the record to support their factual argument about a "ripple effect," and more importantly, the cases defendants cite do not, in fact, excuse defendants from the requirement to comply with the ADA. To the extent that defendants argue that *Love* introduced some discretion on their part when no reasonable accommodations are possible for a disabled inmate, that case is distinguishable here, given that Bowers is requesting a reasonable accommodation that exists—compliance with the ADA Structural Standards.

Finally, defendants emphasize the Department of Justice's Title II Technical Assistance Manual, which is "entitled to controlling weight unless they are 'plainly erroneous or inconsistent with the regulation[s]." [99] at 16 (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)). The sections defendants rely on from the manual, however, do not excuse them from potential liability here. *See* [99] at

16

16 (citing ADATAM § II-3.4000[14]; *id.* § II-3.4100[15]; *id.* § II-3.6100[16]). For example, defendants argue that the DOJ permitted the use of portable shower chairs in lieu of mounted seats in Cermak, and they argue that this exception is "an example of a separate program to be implemented to avoid discrimination." [99] at 18 (citing ADATAM § II-3.4000, § II-3.4100). Yet, as Bowers points out, DOJ's permission did not go into effect until December 16, 2014, which was approximately four months after Bowers was moved out of Cermak and into the RTU. [111] at 9 (citing [96-9] at 10). In any event, I have already concluded that such chairs, in Bowers's case, did not ensure an equal opportunity to benefit from the facility because they did not provide the requisite amount of independence. *See* ADATAM § II-3.4000, § II-3.4100.

There is sufficient evidence in the undisputed record that (if disabled, or if regarded as disabled) Bowers was, at times, denied access to toilets and showers in Cermak and to toilets in the RTU.

---

[14] "A primary goal of the ADA is the equal participation of individuals with disabilities in the 'mainstream' of American society. The major principles of mainstreaming are -- 1) Individuals with disabilities must be integrated to the maximum extent appropriate. 2) Separate programs are permitted where necessary to ensure equal opportunity. A separate program must be appropriate to the particular individual. 3) Individuals with disabilities cannot be excluded from the regular program, or required to accept special services or benefits." ADATAM § II-3.4000.

[15] "A public entity may offer separate or special programs when necessary to provide individuals with disabilities an equal opportunity to benefit from the programs. Such programs must, however, be specifically designed to meet the needs of the individuals with disabilities for whom they are provided." *Id.* § II-3.4100.

[16] "A public entity must reasonably modify its policies, practices, or procedures to avoid discrimination. If the public entity can demonstrate, however, that the modifications would fundamentally alter the nature of its service, program, or activity, it is not required to make the modification." *Id.* § II-3.6100.

### C. Compensatory Damages

To recover compensatory damages under the ADA, Bowers must show that defendants discriminated against him intentionally.[17] *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 n.4 (7th Cir. 2014). The Seventh Circuit has not addressed the standard for establishing intentional discrimination, *see Strominger v. Brock*, 592 Fed.App'x. 508, 511 (7th Cir. 2014); but, the majority of circuits that have addressed this issue have adopted a deliberate indifference standard. *See Reed v. Illinois*, 119 F.Supp.2d 879, 885 (N.D. Ill. 2015). Deliberate indifference "requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) *as amended on denial of reh'g* (Oct. 11, 2001); *see also Olson v. Morgan*, 750 F.3d 708, 713 (7th Cir. 2014) (applying the deliberate indifference standard to inmate's Eighth Amendment claim).

Bowers argues that defendants knew his ADA rights were being violated, but that, nevertheless, they continuously denied him access to an ADA-compliant toilet and shower. As early as January 2013, when Bowers returned to the jail from the hospital in a wheelchair, he argues that defendants were on notice that Bowers needed an accessible toilet and shower. Then again, on March 19, 2013, when Bowers filed a grievance, he says that defendants were on notice that he was being housed in inaccessible conditions. Defendants continued to be on notice that

---

[17] It is sufficient to show that personnel from Cook County or the Cook County Sheriff's Office acted with deliberate indifference. *See Flora*, 2017 WL 2152392 at *6; *Mapp v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, No. 15 C 3800, 2016 WL 4479560, at *4 (N.D. Ill. Aug. 25, 2016).

18

Bowers's rights were being violated, he argues, when they assigned him to several cells that did not have grab bars by the toilet and that did not have mounted shower seats, despite the fact that he used a wheelchair to ambulate.

By contrast, defendants argue that a reasonable jury could find that the reasonable accommodations they made for Bowers were evidence that defendants were not deliberately indifferent. Defendants point to evidence that after Bowers's grievance, the Cook County Sheriff's Office requested lowered shower heads and the addition of grab bars in the showers on the third floor of Cermak, and that Cook County facilitated those changes. They argue that there is no evidence to suggest that the time between the grievance and the installation was due to some deliberate conduct by defendants. [99] at 18. Similarly, defendants argue that there is no evidence to suggest that the time it took Cook County to construct the RTU or to renovate Cermak was due to some deliberate conduct. *Id.* at 20.

There is no explanation in the record as to why these delays occurred; however, the fact that defendants eventually invested time and resources to bring those showers into compliance with ADA requirements, does not provide them immunity for the failure to provide reasonable accommodations for Bowers. Moreover, the clock started ticking for defendants in terms of making changes to the group showers on the third floor of Cermak long before March 2013, when Bowers filed his first grievance. *See, e.g.*, [111] at 9; [110] at 39 (DOJ conducted an architectural survey in February 2011, leading to a report that identifies that the group shower in "Acute Care – Male (3rd Floor, North)" does not have accessible

19

shower features). In other words, the delays lasted for years at a time, which would be enough to suggest deliberate indifference here, because defendants failed to take any other measures or implement other changes in the interim period.

Defendants also reiterate their earlier arguments: they offered an ADA accessible room in Cermak, which he refused; portable toilet and shower chairs were consistently available along with assistance from the nurses; and the RTU had a policy to allow detainees housed in cells that were not ADA-compliant to access the communal ADA-compliant toilet. [99] at 20. Defendants' offers of non-equivalent "accommodations" support, rather than counter, a finding of deliberate indifference. But, if defendants did not regard Bowers as disabled, then there would be no inference of deliberate indifference. In the end, this case turns on whether Bowers was disabled, and a trial is necessary to establish that element of his claims.

## IV. Conclusion

Plaintiff's motion for partial summary judgment, [78], is denied.

ENTER:

Manish S. Shah
United States District Judge

Date: September 29, 2017